May it please the court, my name is Lawrence Schiff. I am counsel to defendant-appellant Fonar Corporation. With me at counsel table is Mr. John McIntyre. I would like to reserve, if I might, five minutes for rebuttal. Well, you can see it speeds by, so watch your clock. I will also try to help you. Thank you, Your Honor. What we're involved with today is the application of the implied covenant of good faith and fair dealing in contract law. The principal issue that is presented to the court, I say the principal. There are some secondary, but if the first one does it, we don't have to go any further. But the principal issue on this appeal is whether the standard of objectively reasonable performance of contractual obligations, as is required under California's implied covenant of good faith and fair dealing, is satisfied by minimal, marginal, and not serious performance of those obligations. Although this Court in July of 2010, in United Investors v. Grant, held specifically that it was not, the lower court held to the contrary and granted the case to Mr. Madison. We believe that was error. And it's error, Your Honor, Your Honors, that affects all areas of law. We just heard from the prior argument about reasonable action taken by a university. And the question turns on what reasonable is. If the lower court decision on what it decided was objectively reasonable is adopted, then anything goes. Well, anything doesn't go if you put it in your agreement first. I mean, that, you know, most agreements have a little more here than disagreements. Well, that's certainly true, Your Honor. But what we're talking about now is something that is implied by the law. In the State of California, it is a very, very well-established principle, which this Court recognized in 2010. It recognized in the Vylene case. I think that's the name. But it isn't a doctrine which extends the contract beyond its terms. Absolutely. I mean, I look at this contract, and your client doesn't start building these systems at that stage. Why is it we should infer there's a heavier obligation on the part of the other party? Because the way the contract is structured, it has to move from stage one to stage two to stage three. The way the contract is written and the way it was supposed to function was there is the signature of an agreement, and it is a sales agreement to sell four units of an MRI machine. There is a down payment that's supposed to be given, which was negotiated down by Mr. Madison, to $300,000 for four machines. And once that contract is signed by both parties, the next step, as Mr. Madison testified twice at the trial, the next step is he has to go out and find sites and propose them to FONAR. And what the contract says is that if FONAR does not approve sites within one year, then he will qualify for a refund. He'll get it back. But it requires that he exercise good faith, go out and look for sites. Now, the fact is that the court below ---- Well, I don't see words that say he has a good faith obligation to go out and look for sites. Now, you're asking us to infer that from what it says here. But I look at these agreements, and I'm not sure exactly what I'm supposed to look at that produces that inference. Well, I think there are three references. There are FONAR-approved sites. Now, how can you get a FONAR-approved site if a guy doesn't propose them to you? FONAR does not have the capability nor the right to tell a customer where he is going to put his machine. It sells him a machine. It's the obligation of the customer to go out, find a place to put it, tell FONAR I found this place. FONAR sends a team that goes and checks whether or not ---- He didn't find any. You don't need to get there. If you don't look, you're not going to find. That's absolutely true. Now, the lower court did hold that he had this affirmative obligation to look. What the lower court also held was that his looking was minimal, his looking was marginal, and his looking was never serious. Now, in terms of everything that was put before the court at the trial, in fact, on plaintiff's own case, because he called Dr. Damadian, the president of FONAR, and he called Mr. Mercer, the salesman of FONAR, who testified that everybody understood, everybody said that Madison would go out, look for sites, and propose them to FONAR. Not only would he look for them, he kept telling them and assuring them that because he was a real estate investor, knew the real estate market in the Bay Area, a very large area, as your honors well know, he'll find this space. That's not a problem. The problem he had, which is what prompted a telephone conference call on June 15, was what would happen if he proposes sites and FONAR comes back with its experts and says, these are not appropriate to install an MRI machine in because there is RF interference. There is noise. There is environmental problems that will not permit this machine to function. It's a very sensitive machine. What will happen if you come back to me after four, I give you four sites, and you say, no, I want my money back? And they agreed that if by the end of the year he doesn't get approved sites, four of them from FONAR, and it says a FONAR-approved site. It doesn't and so let me just stop you. If he goes out and he looks around and he finds a site and he proposes a site and then it's not approved, has he complied with the agreement completely? I don't believe so. I believe he has to be rejected. He has to be rejected for four. And where does it say that in the agreement, the four sites? I believe it says, it says in the agreement that for each site he will get a proportionately ‑‑ for each site rejected, he will get a proportionate refund. Okay.  Where are you reading, counsel? Well, I don't have it in front of me, Your Honor, but I believe it is on page ‑‑ I'm looking at the one that's got the FONAR Corporation, some kind of a logo up the top. It says terms of sale at the top, right? Terms of sale, yes. That's the page, Your Honor. ER 299. Yes. And it says that. This is the ‑‑ It says ‑‑ Counsel, this is the principal contract, right? This is the contract that's ‑‑ There are two pieces of paper that are principal contracts, so found by the court. The first one is the terms of sale. And the second one is the June 29 letter. Okay. Let's start with the terms of sale. Sure. So why don't you go through this and tell me, explain this to me. Okay. If customer does not obtain its last line. Yeah. Approved site locations for each system, the 5 percent good faith deposit for said system is to be returned by FONAR. Said system. So if he finds three but not one, he gets $75,000 back. He finds two but not four, he gets $150,000 back. And that is where it says ‑‑ Now, this document was written by laypersons. Had they called me or some other lawyer and been wise about it, they would have been penny wise. Now, they've been penny wise and found foolish. They would have saved a fortune with this lawsuit because it would have read more properly. But it was written by a layperson, as was the June 29 letter, which was written by Mr. Madison. But that creates a real problem then, doesn't it? Because there's some language in here that you can point to, but the language is really quite ambiguous. There's no question it's ambiguous. There's no question that the June 29 letter is ambiguous. But the testimony clarified it. And the parole evidence was admitted. And it was clear at the testimony, at the trial, that it was a task that Mr. Madison was going to have to undertake, and he was going to submit those to Foner. Now, he didn't deny that it was his obligation to go out and find ‑‑ in fact, in the brief, he says that it was his obligation to go out and find them. The place where we differ, and the only place, and it's a very narrow issue, the place where we differ is what effort was he supposed to put out? That's the entire issue. And the question is, was he supposed to put out an effort that was more than minimal, more than nonserious, more than marginal? And I submit to Your Honors that, Your Honors, in this ‑‑ a year and a half ago, Your Honors held, citing to Minnesota Mutual v. Ensley, which was a case also decided by this Court, and citing to one of the leading cases that I would cite to from the California courts, the Kuehl v. Sullivan case, that minimal effort to investigate a claim and delay in bringing an action is, as a matter of law, not reasonable. And that appears at page 688 of ‑‑ So what's the contract there? Sorry? What's the contract? It was ‑‑ This is all driven by this contract. There's no question. And I look at this contract, and I don't see anything that obligates anybody to do anything. Your client's not starting construction until it receives a further deposit. The other letter, the second part of the contract, makes reference to, we haven't finished our feasibility studies yet, but we understand you want to book this by the end of June, I guess it is. And so we're going to go ahead and go forward so you can book this. This doesn't sound like much of a deal on either side. Well, actually, it is. What it is is a seriatim deal. You do the first step, which obligates me to do the second step, which obligates you to do the third step. The first step is to sign the contract. The second step is, once that's done, we get a deposit. We get that deposit. The next step is you. But we're not doing anything after we get that deposit. We're not going to be out anything. We get a chance to book this like it's a real sale, but it doesn't look like much of a sale to me because everything's so contingent. Well, actually, that's not so, Your Honor. What in here – I mean, yeah, if they'd hired you, they'd have a better shot maybe, but what in here imposes much of an obligation? I mean, this is the – Again, I think the lower court has decided that there was an obligation. The other side – But one that was satisfied by an incredibly minimal search. Well, that's the question that we put to Your Honor. Whether, in fact, when the lower court decides that there was an obligation, which it did, is it satisfied by that? And we're discussing – You're not disputing, as I understand it, the finding that the minimal – the level of search conducted was minimal. You're not saying that's clearly erroneous. Oh, I am. I am. Oh, that's the second point. But I'm not raising that. This is all dealt with in our brief as well, so I'm not going to go through it again. I don't mean to reject – I'm saying for the purpose of our current discussion, we're focused on what's the legal obligation. And I'm trying to figure out what in here drives a higher legal obligation than that. The implied covenant of good faith and fair dealing under the State of California, which obligates a party to use objectively reasonable efforts to perform. And it is found that it has not – And what here requires performance? I believe, again, the Court has found that performance is required. The other side has admitted it's required. I believe it's implied here. And I think the parole evidence established it in the – Why was the performance fully established when they put $300,000 down with them? I mean, that's not – that's not minimal. Well, actually – That's a substantial deposit. Well, actually, but the deposit was there to assure his good faith. This was a good faith deposit. It was to assure his good faith to do what he had to do, which was to find sites. There is no way Fonar – and I'm running close to my blades for my – or is this – That's your total time. Total time. Total time. Well, then I better save a little bit. But, Your Honor, he had an obligation once the contract was accepted, because nothing could happen until he found a site. If he didn't go out and do something, then it would be almost like putting the money in the bank. This was not a banking transaction. It was not a long transaction. But he didn't get the interest. He didn't get – Well, but he wasn't even supposed to get interest unless he requested it. That's what the thing says. But he plunked down the money. Here's the legal question, it seems to me, we have to decide. On the covenant of good faith, in the district court's decision, the last sentence there, he basically says, since he did do some looking and the party's agreement imposed no obligation to submit locations for approval or undertake any particular efforts, the weight of the evidence does not justify a finding that he breached the agreement of good faith and fair dealing. So that seems to me to be partially a fact determination, maybe partly a legal determination. But why was it clearly an erroneous factual determination, and why is it wrong as a matter of law? He says it's a close question, but he has the whole trial, he has the people, he has the credibility, and then he makes this determination. We would have to basically overturn that as a matter of law, correct? I think you would. And in fact, it is a legal question because it's a mixed question of law and fact. It's the application of the principle of the covenant to the facts that he found. And what he found was minimal, marginal, not serious. And the question that Your Honors have to decide as a matter of law is under the covenant, which requires an objectively reasonable performance of whatever obligations the judge found. And the judge found he had an obligation. He didn't say how much. He said an obligation. And the only question is how much. And we believe that the how much is supplied by the covenant of good faith and fair dealing, objectively reasonable. If, in fact, what was done and what the Court found that he did, the minimal and the not serious, met the standard of objectively reasonable, how could anybody say anything about the university's actions? Anything the university, for example. Kagan Let's leave the university out of this. That's the point. Well, forget that. Any case where the issue of reasonableness takes – has a role, any case, will now no longer require much. It will require minimal. It will require not serious. And it will be sufficient because the principle of objectively reasonable, which is required for his performance here, was apparently met by doing nothing. And that, Your Honor, can't do. Kagan You've already exceeded your time. Thank you. Barzine-Berry Thank you very much, Your Honor. Barzine-Berry Good morning, Your Honors. May it please the Court, my name is Barzine-Berry Sabahat, and I represent the plaintiff and appellee in this case. I'll try to be as brief as I possibly can. The points that I have written mostly answer the reply brief. As the Court indicated, the contract is silent about imposing any particular type of duty on Mr. Madison. The contract actually specifically specifies conditions under which the deposit becomes nonrefundable, and that is the second deposit that is to be made. Whether or not something is an action by Mr. Madison is going to be reasonable is something that we still don't know what that action is. As we are standing over here, the FONAR has not elicited any testimony from any of its employees or any expert or even offered as to what it is that it expected Mr. Madison to do. Kagan  Barzine-Berry I agree. I agree. However, I think the lower court found, as a matter of fact, that he did more than nothing. The last report that I was going to make was that, as stated by Mr. Schiff, the contract has two parts, the second part of the contract being the cover letter that my client very eloquently wrote, essentially stating that he has not finished his feasibility studies as to a location. Well, I'm not sure that ineloquent actually expresses. I mean, it sounds to me like it's deceptive. It's suggesting, like, we're honing in. We're nearly finished with our feasibility for specific locations. Was there a feasibility for any particular location? I don't know, Your Honor. I don't know the answer to that. So if that's part of the contract, the suggestion is, look, we're at the final stages. We're not quite sure yet. We're trying to do this by the end of the month, so we'll do it. You put that in comparison with what he was really doing. I mean, he could have written a letter that said, you know, I'm still trying to line up investors, which sounds like the real source of the problem. But that's not the letter he wrote. I understand that, Your Honor. Well, not a problem. I mean, if that's part of the contract, he may have reserved for himself the possibility of finding a feasibility study or finding locations that were or were not feasible. But the notion of I'm still trying to make up my mind in this whole deal, I mean, this wasn't an option agreement, was it? Or do you think it was simply an option agreement? I think it was an option agreement based on the language of the contract. If it were an option agreement, then there'd be no obligation to do anything. And that's not what the district court found. I believe that the contract sets forth that the sale was contingent on him finding these locations. But the district court said it's certainly contingent, but he has to make under the implied duty of good faith, he has to make a good faith effort to find them. Right. And the question is maybe whether the district court erred. Because the district court said it was a closed question, but he did virtually nothing. How can virtually nothing be a good faith effort to go out and at least try to look for something? I think that, first of all, the district court found that he did go out and made at least a marginal effort. And secondly, I think that whether or not something is good faith is dependent on the circumstances and what the contract obligates a person to do. So in this particular case, I think given the totality of the circumstances, what he was obligated to do was try to go out there and find places that made sense to him to run a business, whether or not it was a partnership that he was looking for or a place that was cheap enough that he could run a business out of. In any event, that feasibility study is a condition of this contract. And secondly, no one has ever told him what he needed to do in order to meet the exacting standards that FONAR is now trying to impose. Nobody ever told him that, you know, you're not being serious enough about this. Nobody ever told him that you need to look at four places. Nobody ever told him you need to go to this place or go to that place. Well, maybe it's conduct a feasibility study, which he said he was in the process of nearly finalizing, and you say you don't know whether he ever did any. Isn't that suggestive of maybe he didn't do the minimum he said he was actually doing that would be a breach? No, Your Honor, because whether or not a feasibility study – a feasibility study, to me, might be something that is different than another businessman. If he goes and looks at a place and determines that this particular place with this square footage, with this rent, does not make sense to rent because the income that's going to be generated is not going to be sufficient, that is a feasibility study. Whether or not – I mean, you know, I don't know to what extent he made these studies. Well, can we fairly say that there's evidence to support the proposition? Or let me put it a different way. I don't see evidence that supports the proposition that his problem was not being able to find suitable locations as opposed to finding investors or a broader business deal that he liked the looks of. And it is actually a little hard to imagine in the whole Bay Area he can't come up with a location that would satisfy Fonar's requirements. So that kind of shoves me back to the proposition that you seemed willing to adopt, that your client viewed this as simply an option agreement. Right. That's not what the district court based its decision on. On the other hand, Your Honor, whether or not he can find a partner to get into business with, that could be a part of a feasibility study. A feasibility study could be something very, very broad. And this was a deal that was made essentially in a rush by parties who, as Mr. Schiff said, didn't contact counsel to write their contract. So, you know, we have a situation where vague terms are being used. I'm done. All right. Although you've used your time, I'm going to give you a minute, Mr. Schiff. Well, I hadn't even planned to respond. You don't have to. It's up to you. What lawyer do you know wouldn't respond when given a chance? I think we all would. The question he says that he was never told what he had to do and he was rushed to sign this contract is just nonsense. He started this process in December of 04, and they went back and forth for six months before he signed this document. He knew exactly what he had to do because he testified, or at least there was testimony on his side of the case, that he told them in 60 to 90 days, don't worry about it, I'm going to find space, it is going to be perfect, that's not the issue, you don't have to worry about anything. Everybody told him what he had to do. They told him that it was his next step. He himself acknowledged twice in the testimony that the next step was his. He had to take it. He had to find space. He had to tell them about it, Fonar about it, and then Fonar would check it out. And what I believe the law is crystal clear in California is that under the law of the implied covenant, he had an obligation, knowing what he had to do, to do it in an objectively reasonable way. And what he did and what the Court found he did, assuming the Court was right, what the Court found he did was not objectively reasonable as a matter of law based on this Court's own decisions. Thank you very much, Your Honors. Thank you. Thank you for your argument this morning, gentlemen. The case just argued. Madison v. Fonar is submitted and we're adjourned for the morning. Good morning. Good morning.
judges: McKeown, Clifton, Bybee